In the Matter of THOMAS CHADBOURNE, JR., an Attorney, Respondent.

First Department, March 2, 1923.

Attorney and client — disciplinary proceedings — failure to advise client, trustee of testamentary trust, to turn over to trust estate commissions received on sale of corporate stock held in trust not unprofessional conduct — respondent's client was president of railroad company — respondent procured renewal of option given by underwriters of railroad notes to client to purchase bonds of subsidiary — on refinancing of railroad, bonds were bought by railroad at advance and client profited — act of attorney in procuring reinstatement of option not unprofessional conduct.

An attorney who was engaged by his client to negotiate for the sale of stock held by the client personally and as trustee of a trust estate and by others personally, is not guilty of unprofessional conduct, in failing to advise his client that the part of the commissions received by the attorney in making the sale which he turned over to his client should be paid by the client into the trust estate, where it appears that the attorney was not and never had been the attorney for the estate which was adequately represented by another; that he was the personal counsel merely of his client in that transaction; that his client was one of the leading financial men of New York city, and where it further appears that as soon as the attorney learned that his client had not turned the commissions into the estate, he advised him that it was his duty to do so, and the client acted on that advice.

The respondent's client, who was the president of a railroad company which was in financial straits and was having difficulty in floating short term notes, entered into an agreement on behalf of the railroad with bankers who agreed to underwrite the entire issue of notes on condition that the client would personally assume one-half of the notes, that the notes should be secured by bonds of a subsidiary railroad company, and that the bankers should have an option on the bonds pledged and other bonds at a price stipulated, which option should run for a period of two years. The client and the bankers agreed also that the client should participate in the bankers' option to the extent of twice the amount of the face value of the notes taken by him, and not taken off his hands by the bankers during a period of sixty days following the commencement of the option. This agreement was duly approved by the railroad company. Some time thereafter and after the client's option had expired he received word from the regular bankers of the railroad company that they were then prepared to undertake the refinancing of the railroad company. The respondent, who up to this time had had no connection with or knowledge of the foregoing matters, at the request of his client procured from the bankers who underwrote the notes, a renewal of his option on the bonds of the subsidiary company. Thereafter, the regular bankers entered into an agreement to refinance the railroad company by the terms of which the railroad company agreed to buy in and retire the bonds of the subsidiary company at a price which was considerably higher than that stipulated in the option given to the bankers who underwrote the notes. The client took advantage of his option and received the profit arising from the difference in the price paid and the price at which the railroad company retired the bonds. After the respondent had been retained to secure a renewal of the

option, he became counsel and attorney for the railroad company and partici-
pated in the negotiations for refinancing it.

*Held,* that the act of the attorney in securing the reinstatement of the option did
not constitute unprofessional conduct, was not deleterious to the interests of the
railroad company, and did not constitute in effect a bribe to the bankers, but
had the effect merely of decreasing the profits which the bankers would otherwise
have received.

DISCIPLINARY proceedings instituted by the Association of the
Bar of the City of New York.

*Einar Chrystie* [*Henry L. Stimson* of counsel; *Kenneth M. Spence*
with him on the brief], for the petitioner.

*William D. Guthrie* [*John W. Davis* and *Samuel W. Moore* with
him on the brief], for the respondent.

CLARKE, P. J.:

The respondent was admitted to practice as an attorney at
law in all the courts of this State at the April, 1904, term of the
Appellate Division, First Department, and was practicing in
said department at the time of the acts complained of. Having
been notified by the grievance committee of the Association of
the Bar of the City of New York that his professional conduct
in respect to certain matters was under consideration by said
committee, he appeared before it with witnesses, and a protracted
hearing was had. Thereafter charges of unprofessional conduct
upon his part were formulated and presented to this court by the
Association of the Bar. It was consented upon the hearing in
open court that there was no necessity for a reference but that
the matter should be submitted to the court upon the petition
and the answer and a transcript of the proceedings before the
grievance committee and upon the arguments and briefs had and
presented before the court.

The charge of unprofessional conduct contains two specifications.
One may be termed the Western Union transaction.

In April, 1909, the estate of Jay Gould, deceased, owned about
210,028 shares of the stock of the Western Union Telegraph Com-
pany, and George J. Gould personally owned 7,823 shares of stock,
Edwin Gould 10,300, and Frank J. Gould 901 shares of stock
of said company. Early in the year 1909 George J. Gould informed
the respondent that he was largely interested in the capital stock
of the Western Union Telegraph Company, that he was not satisfied
with the management and earnings of the company and desired
respondent to make an investigation of the company's condition
and business and report to him as to its prospects. Mr. Gould
sent to him the annual reports of the company for a number of
years, and other data, and informed him that he would arrange

that he should have access to the company's records and accounts. Respondent's investigation took from six to eight weeks and was not completed in March, 1909, when Mr. Gould informed him that he was about to go to the West Indies on his yacht and would be absent from New York for several weeks. He authorized respondent, in case his investigation should disclose an unsatisfactory condition, to endeavor to obtain some offer for the stock, and suggested the renewal of negotiations which had been had with Mr. Robert Winsor of Messrs. Kidder, Peabody & Co., some time previously. The result of respondent's investigation and study was the conclusion on respondent's part that the condition and prospects of the telegraph company were not satisfactory, and he prepared a full analytic report thereon which he submitted to Mr. Gould upon his return from the West Indies. Respondent had begun negotiations with Mr. Winsor and finally obtained from him an offer to buy the Western Union holdings of the Goulds at eighty-five dollars per share and in addition a commission to respondent of three dollars and fifty cents for each share of the stock that might be purchased through him. Mr. Winsor said that if any purchases were made by him it must be made upon the express condition that there should be satisfactory assurances against publicity for several months, in order, among other reasons, to enable him to acquire additional stock in the market or by private negotiation, the holdings offered by Gould, namely, about twenty-five per cent, not being sufficient for his purposes.

Upon Mr. Gould's return to New York about the middle of April, 1909, the respondent communicated to him the terms of the offer which had been made to him by Mr. Winsor, namely, eighty-five dollars per share plus commission of three dollars and fifty cents per share, as well as the condition against publicity. Respondent further stated that he intended to turn over the entire commission to Mr. Gould and to leave it to him to fix the amount of respondent's compensation. Mr. Gould told him that he would consult with his associates, and later instructed respondent to notify Mr. Winsor that he and his associates had accepted the terms offered, and instructed respondent to prepare to close the transaction. It was then that Gould furnished respondent with the list of the respective holdings which he was prepared to sell, namely, 210,028 shares belonging to the Gould estate and 19,024 shares belonging to himself, Edwin Gould and Frank J. Gould individually, and further instructed him to secure the right or option to sell on the same terms 28,003 shares for the benefit of other persons whose names he then gave respondent. Respondent at no time had been counsel of the Gould estate, which was then

First Department, March, 1923.     [Vol. 20 ¿

represented by Ex-Judge Dillon. In carrying out the obligation of secrecy which had been insisted upon by the buyers, the transaction was closed at respondent's private office on April 29, 1909, George J. Gould and Edwin Gould being present and the secretary of Mr. Gould. Mr. Benedict of the firm of Kidder, Peabody & Co. and Mr. Winsor's lawyer, Mr. Leverett of Boston, represented the purchaser. Mr. Gould produced stock certificates indorsed in blank for about 229,000 shares, and Mr. Benedict brought with him certificates of deposit and cash amounting in the aggregate to over $19,000,000. The stock certificates and the certificates of deposit and cash were examined by the respective parties, and the certificates of deposit and cash were then delivered to Mr. George J. Gould by Mr. Benedict, and the stock certificates delivered by Mr. Gould to Mr. Benedict. Shortly thereafter the respondent received a check for $801,682, the amount of the commission which the buyer had agreed to pay, received the cash thereon from the Hanover National Bank and immediately carried it up and delivered it to Mr. George Gould, who paid to him the next day $125,000 as compensation for the services he had rendered, which amount was duly entered in his office books. Some eight years thereafter, in April, 1917, in an accounting proceeding in the case of *Gould* v. *Gould,* it appeared that Mr. Gould had not turned over or accounted to the Gould estate for the commission on the shares belonging to it sold as aforesaid in 1909. Thereupon the respondent had an interview with Mr. Gould and inquired of him whether or not he had paid over to the Gould estate its proportion of the commission which respondent had paid to him. Mr. Gould then for the first time informed respondent that he had not paid over the commission to the estate, and respondent and his partner Mr. Shores, who was with him at the time, advised Mr. Gould that in their opinion the estate's proportion of the commission ought to be paid over by him, and he agreed to do so, and on May 1, 1917, he sent to the executors and trustees of the Gould estate his check for $620,401, representing the share of the estate in the commission so turned over to him by respondent in April, 1909, less its proportion of respondent's fee.

Upon the hearing before the grievance committee, the charge in regard to this matter was that Gould had retained the amount of this commission, less $125,000 which he had paid to respondent as compensation for his services, for his own use *with respondent's knowledge and approval.* There was not only no evidence to sustain this charge, but it was overwhelmingly disproved, and, upon the hearing before this court, counsel for the Bar Association stated: " I think there is no evidence before the Bar Association

which would justify the Bar Association in making the charge against Mr. Chadbourne to the effect that he participated with Mr. Gould in the conversion of the commission.   * * *   We do not charge that Mr. Chadbourne had any knowledge that Mr. Gould was making that conversion.   On the contrary, the evidence before the Grievance Committee points very strongly that he did not."

The charge before us then is not that the respondent deceived his client by taking a secret commission on the sale of his client's property, nor that he conspired with the client so that he could personally profit by converting money properly belonging to a trust estate, but that the respondent " was guilty of gross negligence and carelessness in permitting said Gould to receive the aforesaid balance without advising him as to his duty to account to such persons for whom the said Gould had acted in a fiduciary capacity, including the estate of Jay Gould, and without preparing the records and vouchers to the transaction necessary to protect in any future investigation or accounting his said client and those for whom Gould was acting, and taking such other steps as were necessary to insure that Gould was adequately advised of his rights and duties in respect to the transaction."   We think there is no substance in the charge.   It should be recalled that at that time, 1909, Mr. Gould was one of the leading financial men in New York city; that he had been intrusted by his father with almost unlimited powers as the managing executor of his vast estate; that in this very transaction he had received some $19,000,000, the greater bulk of which was obtained from the sale of the stock belonging to the estate, of which he was one of the executors; that the respondent was not and never had been the attorney for the estate which was adequately represented by Judge Dillon; that he was the personal counsel in this matter of Mr. Gould. Can it be possible that it was respondent's duty, under such circumstances, to advise his client that he should not convert or steal the $19,000,000 that he had received from the sale of the securities and the $600,000 of the commission?   It seems to me that it would be preposterous to base a charge of professional misconduct upon the failure to warn a client, under such circumstances, that he must be honest, because some eight years afterwards it appeared that the client had not accounted for the amount in question, especially in view of the undisputed evidence that as soon as the respondent learned of that fact he advised the client that it was his duty to do so and the client had acted on that advice. It seems to me that it is crowding professional obligation beyond any workable limit to hold that an attorney is guilty of professional

First Department, March, 1923.          [Vol. 204

misconduct who under such circumstances did not have the foresight to voluntarily advise his client to be honest.

In respect to this charge we find no basis whatever for criticism of the respondent and find him not guilty of the charge.

The second specification may be termed the Missouri Pacific transaction.

In January, 1908, the Missouri Pacific Railway Company was in financial difficulties and had to make provision for the payment of an outstanding issue of $6,000,000 face value of two-year five per cent notes maturing February 10, 1908. Certain bankers whom the company had requested to refinance said notes had declined to do so. The Kansas and Colorado Pacific Railway Company, a subsidiary of the Missouri Pacific, was indebted to it in large amounts and had issued or was about to issue its thirty-six-year six per cent bonds to the amount of approximately $19,000,000 par value. On or about January 20, 1908, Mr. George J. Gould, president of the Missouri Pacific Railway Company, entered into negotiations with the banking house of Tailer & Co. with the result that they agreed to purchase or underwrite $6,000,000 face value of new two-year six per cent convertible notes of the Missouri Pacific Railway Company to take up the issue of two-year five per cent notes maturing on February 10, 1908, upon condition (1) that Mr. Gould would personally assume one-half of the obligation, that is, that he would underwrite $3,000,000 of the notes; (2) that the notes should be secured by the pledge of $12,000,000 face value of the Kansas and Colorado Pacific Railway Company bonds, and that such bonds should be guaranteed as to principal and interest by the Missouri Pacific Company; and (3) that said bankers should have an option on the bonds so pledged and upon approximately $7,000,000 bonds of the same issue similarly guaranteed at eighty-seven and one-half per cent of their face value, less a commission of two and one-half per cent, which option should run for a period of two years, that is, until February 10, 1910. In case of the conversion of the notes into bonds, Tailer & Co. were to be entitled to the same commission, and it was provided that in such case the difference between their option price on the bonds, eighty-seven and one-half, and par should be credited and accounted to them in bonds at eighty-seven and one-half. It was also agreed between Mr. Gould and Tailer & Co. that Gould, in consideration of his assuming one-half of the risk, should participate in the options of Tailer & Co. to the extent of twice the amount of the face value of the notes taken by him and not taken off his hands by Tailer & Co. during the period of sixty days following February 10, 1908. A memorandum

was entered into dated January 20, 1908, which together with a letter from Tailer & Co. to Gould of the same date embodied the agreement, and said memorandum and letter were submitted to the board of directors of the Missouri Pacific Company at a meeting held on January 30, 1908, and duly approved by that board. Each document contains the notation by the secretary of the railway company as follows:

"Read in full at meeting, Missouri Pacific Board, January 30th, 1908, and approved.                A. H. CALEF."

At this meeting nine directors were present including Mr. Gates, who was Mr. Rockefeller's representative, Mr. Stuyvesant Fish, formerly president of the Illinois Central Railroad Company, and Mr. Slocum, the representative of Mr. Russell Sage. At their annual meeting held on March 10, 1908, the stockholders of the Missouri Pacific Company approved all the acts of the directors during the previous year. The agreement of January 20, 1908, was duly carried out. The new issue of $6,000,000 of two-year six per cent convertible notes was taken by Tailer & Co.; $2,800,000 face value thereof were taken by Mr. Gould, and the old two-year five per cent notes were retired.

The new notes were secured by a pledge under a collateral trust indenture of $12,000,000 face value, of Kansas and Colorado Pacific thirty-year six per cent bonds, guaranteed as to principal and interest by the Missouri Pacific Company, but they were not made redeemable before maturity in 1938. The new notes were convertible into the pledged Kansas and Colorado Pacific bonds, par for par, and the right of conversion could be exercised by the noteholders even after call for redemption and up to the time of redemption. As to the $2,800,000 face value of six per cent notes thus taken by Mr. Gould, he was entitled to option rights in twice that amount of $5,600,000 face value of Kansas and Colorado Pacific thirty-year six per cent bonds. The sixty-day option of Mr. Gould expired, and he had remaining $320,000 face value of said notes, entitling him to option rights in bonds in double the amount, or $640,000.

In November, 1908, Mr. Gould was informed by a member of the firm of Kuhn, Loeb & Co. that said firm was then prepared to undertake the refinancing of the Missouri Pacific Railway Company. He communicated this information to the respondent, who was then his personal counsel, and who up to this time had no connection with or knowledge of the foregoing matters, informed him of these facts and requested respondent to go on his behalf

30

to Tailer & Co. and inform said firm what Mr. Kuhn had said and to add that he would like to be restored by Tailer & Co. to his original interest in the option on the Kansas and Colorado Pacific bonds so far as still practicable. The respondent, upon said request, had an interview with Tailer & Co. and induced Tailer & Co. to accede to his request; and that is evidenced by Exhibit C, attached to the petition dated November 19, 1908, addressed to Mr. Gould and signed by Tailer & Co. The petition alleges that " the respondent at all the aforesaid times knew that Gould was the President and a director of the Missouri Pacific Railway Company, and that he normally would represent said Company in all important negotiations with Kuhn, Loeb & Co., for the re-financing of said Railway Company, and that there would be imposed upon the said Gould a fiduciary duty of protecting to the utmost the interest of said Railway Company and its security holders in such negotiations. In December, 1908, the respondent became counsel and attorney for the Missouri Pacific Railway Company and acted as such counsel and attorney throughout the subsequent negotiations with Kuhn, Loeb & Co. for the re-financing of said Company. During said negotiations it was determined that as incidental to the re-financing of the said Railway Company all of the bonds aforesaid of the Kansas & Colorado Pacific Railway Company should be retired and paid off by the Missouri Pacific Railway Company, and the respondent and Gould participated in such determination. Furthermore the respondent with the said Gould as President and representative of the Missouri Pacific Railway Company negotiated and made a contract with Kuhn, Loeb & Co., dated February 5, 1909, whereby Kuhn, Loeb & Co. agreed so far as possible to acquire and sell to the Railway Company and the Railway Company agreed to pay Kuhn, Loeb & Co. the price of $107\frac{1}{2}$ and accrued interest for all of said bonds so sold. In November 1908, and as petitioner is advised and believes, immediately after they had received information from respondent that Kuhn, Loeb & Co. would undertake the re-financing of said Missouri Pacific Railway Company as aforesaid, Tailer & Co. began to exercise their option and to purchase the bonds aforesaid from the Missouri Pacific Railway Company at the price of 85, in accordance with the option held by them, and on February 5, 1909, the same day as the execution of the contract above mentioned, Tailer & Co. so purchased $7,033,000 in par value of said bonds at said price of 85. Tailer & Co. continued under their said option to purchase said bonds at 85 from the Missouri Pacific Railway Company up to March 15, 1909, by which time they had purchased altogether $13,878,000 par value of said bonds. All of these

bonds were subsequently resold to Kuhn, Loeb & Co. at various prices ranging from $102\frac{1}{2}$ to $107\frac{1}{2}$, and all of said bonds were subsequently resold by Kuhn, Loeb & Co. to the Missouri Pacific Railway Company at $107\frac{1}{2}$. By the purchase and re-sale of the said bonds under their option as aforesaid, Tailer & Company realized great profits, amounting to several million of dollars at the expense of the Missouri Pacific Railway Company, and the said Gould received from Tailer & Company from the profits so realized, as the share coming to him by virtue of the agreement of November 19, 1908, negotiated by the respondent the sum of not less than $387,000. Throughout the said period of negotiations for financing the Missouri Pacific Railway Company the respondent was counsel and attorney for said Railway Company and assumed actively to represent it as such counsel and attorney in said negotiations. The respondent was well aware that Gould was personally interested in the option agreement above mentioned and that his said interest was adverse to the interest of said Railway Company which Gould and respondent were assuming to represent. Nevertheless the respondent permitted said negotiations to proceed under the active management of said Gould, assuming to represent said Railway Company therein, without making any protest on his part or seeking in any way to protect the interest of said Railway Company against the adverse interest of said Gould. The respondent himself as counsel for said Railway Company also took an active part in said negotiations and re-financing of said Company although he well knew that, as aforesaid he had been the personal attorney for Gould in obtaining for him the adverse interest in said options," and it charges the respondent with professional misconduct in brief as follows:

*First.* In assisting George J. Gould, as his attorney, to make disclosure of alleged confidential information obtained by Gould as president and director of the Missouri Pacific Railway Company; *secondly,* in assisting Gould in November, 1908, to obtain a share in the option of the Kansas and Colorado Pacific bonds then held by Tailer & Co.; *thirdly,* in permitting and assisting Gould in representing the Missouri Pacific Railway Company in certain negotiations; and, *fourthly,* in acting as attorney for the Missouri Pacific Company in the transactions relating to the purchase by it of the Kansas and Colorado Pacific bonds.

The petitioner summarizes in its brief this charge as follows: Respondent in the autumn of 1908 negotiated a " corrupt bargain " between George J. Gould and Tailer & Co., whereby Tailer & Co. agreed to give Gould a share in the profits to be derived by Tailer & Co. from certain options which Tailer & Co. held against the

Missouri Pacific Railway Company, in the hope and expectation of inducing Gould to render said options more valuable in an impending readjustment of the railway's finances, and whereby Gould accepted such a share in its profits in violation of his duty to his company. As growing out of and connected with the offenses it claims: (1) That in making the corrupt bargain the respondent assisted Gould in disclosing to Tailer, an adverse party, information of which Gould had become possessed solely in his capacity as president of the Missouri Pacific Railway Company and which belonged to said company, and the betrayal of which was injurious to said company. (2) That after making the corrupt bargain, respondent accepted a retainer from the railway company as its attorney and sat through the negotiations with Gould, without making any protest against Gould's representation of the company in spite of his knowledge of the corrupt bargain and of Gould's adverse interest in the negotiations. (3) That the respondent undertook to represent the railway company in the negotiation of the contract between the railway company and Kuhn, Loeb & Co., after he had represented Gould in obtaining an interest which was involved in and affected by the contract with Kuhn, Loeb & Co. Again the petitioner says: To sum up, the short characterization of this offense by the respondent, as we see it, is that he went to Tailer and asked Tailer for what amounted to a bribe for his client Gould. That Tailer yielded to the request in the belief that it was a bribe and it would influence the official conduct of Gould, and that any other man placed in Tailer's situation would have held the same belief. That this was no hasty adventure on the part of respondent, but was taken with deliberation and with full knowledge on his part, or opportunities for knowing all the circumstances of the transaction.

Upon the hearing before the grievance committee it was attempted to be established that the respondent had, upon Gould's direction, gone to Tailer & Co. and secured the agreement of November 19, 1908, after Kuhn, Loeb & Co. had demanded the purchase of these outstanding Kansas and Colorado Pacific bonds by the Missouri Pacific Railway Company, and with knowledge by the respondent of those facts. That claim is thoroughly disproved. Gould sent the respondent to see Mr. Tailer in consequence of a casual talk on the street with Mr. Kahn of Kuhn, Loeb & Co., who said that he thought they were about ready to take up the question of refinancing the Missouri Pacific Railway. Mr. Kahn's affidavit sets forth: " According to the best of my present recollection the first time the requirement that the Kansas & Colorado Pacific 6% bonds should be cancelled or acquired and pledged

under any new mortgage was ever suggested by my firm or any one in its behalf was in January, 1909. I am certain, however, that nothing of the kind had ever been mentioned or suggested by us to Mr. Gould or any one else at any time prior to December, 1908." It seems to me, therefore, that the gist of this inquiry is, whether the act of the respondent in obtaining from Mr. Tailer a reinstatement of the interest which Gould had theretofore possessed in the Tailer & Co. option was, as is claimed, a corrupt bargain. No attack is made upon the original agreement between Gould and Tailer & Co. of January 20, 1908, months before the respondent had anything to do with the Missouri Pacific railway affairs. That agreement was made at a time when the company was in desperate straits and when its ordinary bankers had declined aid. Tailer & Co. insisted upon Gould participating in the underwriting to the extent of one-half of the $6,000,000 provided. This agreement and Gould's participation therein had been reported to the board of directors, approved by it, and subsequently ratified by the stockholders. It was a legal and binding contract. It secured to Tailer & Co. the option for two years. Tailer's agreement with Gould limited his participation to two months. This period had expired, and Gould still had $320,000 of notes carrying the option for $640,000 worth of bonds. If this original agreement was legal and valid, as I think it was, I cannot see how any reinstatement of Gould could have been, in any shape, manner or form, deleterious to the interests of the Missouri Pacific Railway Company. It did not add anything to its responsibilities or liabilities thereunder. The option existed in Tailer's hands and it had upwards of a year to run. The only possible detriment to any one, as it seems to me, would be to Tailer & Co., its profits being reduced by so much as Gould's participation therein amounted to. The respondent, at Gould's request, represented that as during the very hard financial times succeeding the panic of 1907 Gould had been required by Tailer & Co. to assume one-half of the obligations of the underwriting, that in fairness, now that the situation was eased and there was a prospect of help from the former bankers of the company, he ought to be allowed to be reinstated. I cannot find in the evidence anything that the respondent did or said that warrants the conclusions that knowingly or unknowingly he participated in the making of a corrupt bargain for his client, or that he had any notion that he was engaged in offering a bribe to Tailer & Co. It seems to me that he had a right, upon what he knew of the situation as it then was, at the request of his client, to ask for him that he be put back into the situation which he formerly occupied and which was, when he occupied it, known

to and approved by the board of directors and hence legal. It should be borne in mind that Mr. Gould is not on trial in this proceeding, and that the respondent is not here to answer for any possible derelictions of duty of his client discovered or claimed in subsequent litigation. The matter with which the respondent is charged here is that it was unprofessional for him to have obtained, at the request of his client, from Tailer & Co. the agreement of November 19, 1908. I do not think that it was. We have examined the record and briefs with the greatest care, and have reached the conclusion that the charges were not proven and that the petition should be dismissed.

Dowling, Page, Merrell and McAvoy, JJ., concur.

Proceeding dismissed. Settle order on notice.